MEYERS, ADMR., *v.* CLARKIN.

(Decided April 16, 1929.)

*Messrs. Buchwalter, Headley & Smith,* for plaintiff in error.

*Mr. Froome Morris,* for defendant in error.

HAMILTON, J.  The defendant in error, Peter J. Clarkin, brought suit in the court of common pleas

against Dr. C. H. Meyers, charging malpractice and resulting damages. During the pendency of the case, Meyers died, and the action was revived in the name of the administrator of his estate.

`The case was tried to the court and a jury, resulting in a verdict for Clarkin in the sum of $8,375. The trial court, on motion for a new trial, required a *remittitur* of $2,375, which was accepted by the plaintiff, and judgment was entered for $6,000. From that judgment the defendant, plaintiff in error here, prosecutes error to this court.

Three specifications of error are stressed: (1) Failure of proof. (2) The action was barred by the statute of limitations. (3) The verdict and judgment are against the weight of the evidence, and are excessive.

The first consideration will be the question of the bar of the statute (Section 11225, General Code).

The rule applicable to such cases as to when the cause of action begins to run is laid down in the case of *Bowers* v. *Santee,* 99 Ohio St., 361, 124 N. E., 238. The second paragraph of the syllabus reads: "In an action for a breach of the contract in such case [malpractice], the statute of limitations does not begin to run until the contract relation is terminated."

The rule as to the termination of the contract is suggested in the opinion, wherein, on page 365 of 99 Ohio State, 124 N. E., 238, the first and second paragraphs of the syllabus in the case of *Gillette* v. *Tucker,* 67 Ohio St., 106, 65 N. E.; 865, 93 Am. St. Rep., 639, are quoted with approval, as follows:

"1. A surgeon and physician, employed to treat a case professionally, is under an obligation, which

the law implies from the employment, to exercise the average degree of skill, care and diligence exercised by members of the same profession, practicing in the same or a similar locality, in the light of the present state of medical and surgical science; and that he will indemnify the patient against any injurious consequences which may result from his want of ordinary skill, care and attention in the execution of his employment.

"2. It is the duty of the physician and surgeon to exercise due and ordinary skill, care and attention, not only in and about an operation which he decides to be necessary, but also, in the absence of a mutual understanding, or notice to the contrary, to render such continued further care and treatment as the necessity of the case requires; and he is liable for injuries and damages which proximately result from the want of such ordinary skill, care and attention."

The court, in the opinion in the case of *Bowers* v. *Santee*, further says, page 365 of 99 Ohio State, 124 N. E., 238, 240:

"The doctrine is promotive of the exercise of reasonable skill, care and treatment by the surgeon, not only at the specific time of the operation, but also during the subsequent period of treatment necessary to a reasonable and substantial recovery.

"The patient relies almost wholly upon the judgment of the surgeon, and under the usual circumstances of each case is bound so to do, and if the injury is not reduced, and a normal condition restored, as fully or as speedily as expected, the patient is still at liberty to rely upon the professional skill, care and treatment to complete such recovery

so long as the surgeon continues his employment with reference to the injury.''

The facts to which we must apply this rule of law are, in substance, as follows:

On the 31st day of March, 1923, the plaintiff, Clarkin, fell on the sidewalk near his home, and received injuries. He reached his home about 7 o'clock, and about 9 o'clock the same evening he called Dr. C. H. Meyers and requested him to visit him at his home. The doctor stated that he believed the plaintiff had suffered a fracture of his right leg. Some time later, probably the next day, Dr. Meyers took an X-ray photograph of the right leg, and returned Monday with the photograph. This photograph showed a transverse fracture of the upper third of the shaft of the femur. Clarkin was placed on his back in bed at this time, and a table board was placed under the foot and leg, up to the hip, and a weight placed on the foot. The plaintiff remained in this position for a period of one day. The next day, Tuesday, he was taken to the Seton Hospital, where he was placed in bed in a flat position, with a weight on his foot, and his legs parallel to each other. Upon his entrance into the hospital, Dr. Meyers filed his report, in accordance with the rules, in which he stated, under the head of diagnosis: "Fracture, upper third right femur; Complication, none; Operation, none." The patient remained in the hospital in the position as above stated for 12 days, when he returned home, and remained with a cast on his leg for a period of six weeks. The cast was taken off at the end of six weeks, and the plaintiff was advised to get out of bed and stand

on his feet. This caused the plaintiff pain. He was put back to bed, and an extension ring applied. This is a long, round brace, with a ring which is placed around the top of the thigh at the groin. He remained in bed about three weeks when the ring was removed, and plaintiff was again advised to get on his feet and move around on crutches. He got around the room in this manner with much pain. This continued through the summer of 1923. During this time, plaintiff made a suggestion about getting a specialist, as he was not improving, which was opposed by Dr. Meyers.

In October, 1923, the brother of plaintiff took the plaintiff to Dr. Lang for an X-ray. Neither the plaintiff nor the brother, however, communicated to Dr. Meyers the fact of the taking of this X-ray.

Mrs. Clarkin, the wife of the plaintiff, testified that Clarkin, while getting around somewhat on crutches, had pain all the time, and that that continued for months; that Dr. Meyers came to the house to see the plaintiff every Saturday morning until the middle of May, 1924; that about that time her husband was able to get around on crutches; that when Dr. Meyers would call on Saturday morning he would have plaintiff, her husband, walk through the room, and that that was all he would do, notice his walking; that at about this time Dr. Meyers ceased his calls; that there were no circumstances attending the stopping of the doctor's calls, but that "he just stopped coming;" and that there was nothing said by the doctor, the husband, or the wife about the "doctor not coming any more."

The petition in this case was filed April 17, 1925. The trial court submitted to the jurors the question

whether, under the evidence, the contractual relationship, as explained to them, had ended more than one year before the bringing of the action, and instructed the jury that if they should find from the evidence that "defendant's decedent, that is, Dr. Meyers, ceased to care for and treat the plaintiff for the injuries sustained by plaintiff on March 31, 1923, that is prior to the 16th day of April, 1924, your verdict should be for the defendant herein." The court further explained to the jury what facts would constitute the cessation of such relationship, in accordance with the law as laid down in *Bowers* v. *Santee, supra.*

This question was properly submitted to the jury and was determined by it in favor of the plaintiff, and we think rightly so, under the rule laid down in the case of *Bowers* v. *Santee, supra.*

The next question of error for consideration involves all the remaining points, which will not be commented upon separately. This goes to the question whether or not there is any evidence to prove the plaintiff's case, and whether there is sufficient evidence to support the verdict.

The malpractice grows out of the diagnosis of Dr. Meyers at the time he took charge of the case, and his failure in that respect subsequent thereto.

It appears that at the time of the injury, Clarkin, in addition to suffering a fracture of the upper third of the femur, also had a break of the neck of the femur. The evidence is clear that Dr. Meyers did not in his diagnosis discover the break of the neck of the femur, the more serious fracture; and, in so far as the record shows, did not discover it, if at all, for more than a year after the occurrence of the injury which he was employed to treat.

It will be noted in the statement of facts, as bearing on the bar of the statute of limitations, that Dr. Meyers had called at different times on Clarkin up until about the middle of May, 1924, which was more than a year after the injury occurred.

It appears that about the middle of July, 1924, Clarkin had an X-ray specialist make an X-ray picture of his hip. This X-ray photograph disclosed a break of the neck of the femur; and that the broken part attached to the shaft of the leg was pushed up about an inch from the normal position, and indicated no bony union.

Clarkin went to Dr. Jos. DeCourcy, who performed an operation on the hip, by breaking down the fibrous union which existed, and spiking the two pieces of the neck together, immobilizing the leg by abduction. This operation proved to be a failure.

Some time in 1925, Clarkin called on Dr. Albert H. Freiberg, who performed a second operation. Dr. Freiberg testified that he found there was no union at the seat of the fracture of the neck of the femur; that the bone peg which had been inserted had broken and Clarkin was suffering pain and unable to use the limb; and that then he performed what is known as a reconstruction operation on his hip. That operation consisted of taking out the head of the thigh bone and replacing the upper end of the thigh bone in the socket. The evidence is that fairly good results were obtained from this operation, but that Clarkin is permanently crippled.

It is conceded that Dr. Meyers' treatment of the fracture of the upper third of the femur was successful and a perfect cure was had.

Enough has been stated to show the difficulties surrounding the case on the question of proof to

entitle Clarkin to the judgment obtained. That Dr. Meyers did not discover the fracture of the neck of the femur at the time of his engagement, nor for a long time thereafter, as heretofore stated, is clearly shown. The question then arises under the evidence, what damage resulted from this neglect or failure to exercise reasonable skill in discovering and treating the break of the neck of the femur?

That such a break is most difficult to treat and correct, and that there are few permanent cures effected, is shown. Different methods of treatment are suggested in the medical testimony in an attempt to get a union of such a break. It is in evidence that about 40 per cent. of such unions are fibrous. It is in evidence that the operations performed are known as secondary, in an attempt to correct such a break. There is evidence tending to show that nature is given the first chance, and the proper remedy to be used by the surgeon is to endeavor to line the broken parts by some method, which is always difficult, and thus permit nature to create a fibrous or bony union, as it may.

Under this situation the question arises: Had Dr. Meyers, under a proper diagnosis, discovered the broken neck of the femur, what could, or should, he have done about it? And, if negligent, how much did that neglect affect or contribute to the suffering, pain, and injuries claimed and shown to exist in this case?

It is in evidence that the fracture of the upper third of the femur complicated the case. Undoubtedly, the discovery of the fracture of the upper third of the femur misled Dr. Meyers in his diagnosis of the injury, but the jury might well have found that this discovery would not excuse further careful examination.

. We have suggested these many complications to show that, having found the Doctor to be at fault in his original diagnosis, and further in his failure to discover the break, the extent of the damage caused by this neglect is more or less speculative. If Clarkin's present condition and the suffering that he endured, and the expenses incurred, can all be traced to Dr. Meyers' failure to discover the break of the hip, the amount of the judgment is indeed small.

The jury must, therefore, have thought, and the trial court must have concluded, that the whole damage could not be traceable to this neglect on the part of Dr. Meyers.

It therefore seems to us that, to disturb the judgment on the evidence, this court would have to speculate at least as much as the jury. That there is in all such cases more or less speculation on the part of the jury has long been recognized by the courts, and the above of necessity follows.

There is no objection to the general charge of the court, the giving of the special charges, or to the court's rulings on the testimony.

The jury having found, under the direction of the court, that the action was brought within one year after the termination of the contractual relationship of the plaintiff and the defendant, our conclusion is, while the amount of the damage must of necessity have been speculative, that we are not justified in reversing the judgment on the evidence.

The judgment is therefore affirmed.

*Judgment affirmed.*

Cushing, P. J., and Ross, J., concur.